IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy No. 04-30236 |
| Racing Services, Inc., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adversary No. 06-7020 |
| | ) | |
| ―――――――――――――― | ) | |
| | ) | |
| PW Enterprises, Inc., a Nevada corporation, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Case No. 3:12-cv-112 |
| -vs- | ) | |
| | ) | Appeal from District of North Dakota |
| State of North Dakota, a governmental | ) | Bankruptcy Court |
| entity; North Dakota Racing Commission, a | ) | |
| regulatory agency; North Dakota Breeders | ) | |
| Fund, a special fund; North Dakota Purse | ) | |
| Fund, a special fund; and North Dakota | ) | |
| Promotions Fund, a special fund, | ) | |
| | ) | |
| Appellees. | ) | |

## INTRODUCTION AND SUMMARY OF DECISION

PW Enterprises, Inc. appeals from an adverse bankruptcy court decision in which the

bankruptcy judge concluded that North Dakota law authorized the collection of taxes on account

wagering. Aside from the State,[1] PW Enterprises was the largest creditor in Racing Services,

Inc.'s ("RSI") bankruptcy. PW Enterprises initiated an adversary proceeding to recover money

collected by the State when RSI was insolvent. Because there was no statutory authority

directing the collection of taxes for account wagering during the time period in question, the

---

[1] The State collectively includes the State of North Dakota, the North Dakota Racing
Commission, and the funds administered by the Racing Commission, including the North Dakota
Breeders Fund, the North Dakota Purse Fund, and the North Dakota Promotions Fund.

State must return the money to the bankruptcy estate. The bankruptcy court's decision granting summary judgment in favor of the State is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

## LEGISLATIVE BACKGROUND

North Dakota's parimutuel horse racing laws evolved over a number of years. A brief time line gives context to the status of the law during the time period in question. In 1987, North Dakota legalized parimutuel horse racing under the certificate system. N.D. Cent. Code § 53-06.2-10. In order to participate bettors had to attend a live horse race in North Dakota. The legislature also enacted a "take-out statute", N.D. Cent. Code § 53-06.2-11, which established formulas for collecting certain amounts from each day's parimutuel pool total, including allotments for tax payments to the State of North Dakota. Revenue derived from parimutuel horse racing was directed to the general fund under the state treasurer's control and to three special funds administered by the North Dakota Racing Commission - the North Dakota Breeders Fund, the North Dakota Purse Fund, and the North Dakota Promotions Fund.

Two years later, the legislature authorized off-track parimutuel wagering. N.D. Cent. Code § 53-06.2-10.1 (1989). This allowed bettors to wager on horse rases within and outside of North Dakota. The legislature also modified the take-out formulas. In 1991, the legislature amended § 53-06.2-10.1 to reclassify "off track wagering" to "simulcast wagering." [2]

It was not until 2001 that the North Dakota Legislature authorized "account wagering" as

---

[2] The North Dakota Racing Commission is the administrative agency responsible for regulating horse racing and has the authority to adopt administrative rules. In 1990, the Racing Commission adopted regulations for "simulcasting" of horse racing, which, at the time, the statute referred to as parimutuel wagering.

a form of parimutuel horse racing.  N.D. Cent. Code § 53-06.2-10.1 (2001).  The statute

provided, in relevant part:

> The certificate system also permits parimutuel wagering to be conducted through account wagering.  As used in this section, 'account wagering' means a form of parimutuel wagering in which an individual deposits money in an account and uses the account balance to pay for parimutuel wagers.  An account wager made on an account established in this state may only be made through the licensed simulcast service provider authorized by the commission to operate the simulcast parimutuel wagering system under the certificate system. . . . .

Players could thus bet against each other rather than the "house."  An account wager could be

made in person, by telephone, or through other electronic communication.  Id. There was no

change made to the take-out statute during the 2001 legislative session. Thus, the 1995 version

remained in effect, which provided the following bet payoff formulas:

> 1.  For each day of a live  race meet or a simulcast day in this state on win, place, and show parimutuel pools, the licensee shall deduct up to twenty percent of the total win, place, and show pool. The licensee may retain seventeen percent for expenses. One-half of one percent must be paid to the North Dakota racing commission to be used for the North Dakota purse fund. One-half of one percent must be paid to the North Dakota racing commission to be used for the North Dakota breeders' fund for the respective breed of horses racing at that meet. The remaining two percent must be paid to the state treasurer to be deposited in the general fund.
>
> 2.  For each day of a live race meet or a simulcast day in this state for each daily double, quinella, exacta, trifecta, or other wager combining two or more horses for winning payoffs, the licensee shall deduct up to twenty-five percent of each wagering pool. Of this amount, the licensee may retain twenty-one percent for expenses. One-half of one percent must be paid to the commission to be deposited in the purse fund. One-half of one percent must be paid to the commission to be deposited in the promotion fund. One-half of one percent must be paid to the  commission to be deposited in the breeders' fund. The remaining two and one-half percent must be paid to the state treasurer to be deposited in the general fund.

N.D. Cent. Code § 53-06.2-11 (1995).

In 2007, the legislature amended the take-out statute to create a new category for account

wagering.  N.D. Cent. Code § 53-06.2-11 (2007).  This is the first time the legislature established

3

formulas specific to account wagering:

> 1.  For wagering on live horse racing and simulcast wagering:
>
> a. In win, place, and show parimutuel polls, the licensee may deduct no more than twenty percent of the amount wagered. Of the amount wagered, the licensee shall pay . . .
>
> 2.  For account wagering:
>
> a. In win, place, and show parimutuel pools, the licensee may deduct no more than twenty percent of the amount wagered.
>
>> (1)    Before eleven million dollars is wagered. . .
>>
>> (2)    After eleven million dollars is wagered . . .

N.D. Cent. Code § 53-06.2-11 (2007).

Gambling is a closely regulated activity that expanded over a number of years in North Dakota.  The focal point of the dispute in this case is the State's authority to collect taxes on account wagering during 2002 and 2003.

## FACTUAL BACKGROUND

RSI applied for a simulcast service provider[3] license on March 26, 1993.  The Racing Commission approved the application.  RSI and Team Makers, Inc., a charity and service operator[4], entered into a parimutuel wagering service agreement, in which Team Makers was responsible for collecting the net proceeds, including the taxes.  RSI, in turn, was responsible for

---

[3] A simulcast service provider means a person engaged in providing simulcasting services to a simulcast operator and establishing, operating, and maintaining the combined parimutuel pool, but does not include persons authorized by the federal communications commission to provide telephone service or space segment time on satellite transponders. N.D. Admin. Code § 69.5-01-11-01.

[4] A simulcast operator means an eligible organization licensed by the Racing Commission to offer, sell, case, redeem, or exchange parimutuel tickets on races being simulcast from a sending track. N.D. Admin. Code § 69.5-01-11-01.

disbursing the money to authorized regulatory agencies, including the State.

PW Enterprises developed software for the sole purpose of wagering on horse races in the United States and Canada.  From 2002 to 2003, PW Enterprises engaged in parimutuel account wagering on horse races in North Dakota through an account deposited with RSI.  At the end of July 2003, PW Enterprises' account reflected $2,245,301.11 in winnings and other monies on deposit with RSI.

In approximately July 2003, PW Enterprises learned RSI was under investigation for an illegal gaming operation.  PW Enterprises stopped wagering through RSI.  On July 31, 2003, PW Enterprises made a demand for its account holdings with RSI.

Between July 2003 and September 2003, PW Enterprises' attorney contacted the State on behalf of PW Enterprises to inquire about the State's plan for stabilizing RSI.  PW Enterprises was concerned about protecting its interests and was open to discussing a mutually beneficial path for both the State and PW Enterprises.  PW Enterprises had identified two options for recovering its money held by RSI: (1) file a lawsuit and seek a writ of attachment for the amount RSI owed PW Enterprises, or (2) support the State's decision to appoint a receiver and rely on the State to protect its interests.

As of August 18, 2003, PW Enterprises believed the State was going to protect its interests and that if it filed a lawsuit, it would have a catastrophic effect on the future business of RSI.  PW Enterprises believed that if a "major player" filed a complaint against RSI alleging RSI was not distributing winnings there would be a tremendous disincentive to participate in North Dakota wagering.  PW Enterprises was interested in (1) maximizing its recovery, and (2) exploring the possibility of once again wagering in North Dakota.   PW Enterprises signed an

5

affidavit supporting the State's decision to appoint a receiver.

The State sought a receiver for RSI on August 21, 2003, and the next day a receiver was appointed. PW Enterprises assumed the receiver would operate RSI, stabilize RSI, and find a way to maximize the monies owed to both the State and PW Enterprises. Between February 2003 and December 2003, the State collected a total of $5,320,101.20 from RSI as taxes due and owing for parimutuel account wagering.[5] PW Enterprises, RSI's largest non-governmental creditor, has not recovered any money from the account it held at RSI.

RSI filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 3, 2004. The case was converted to a Chapter 7 bankruptcy on June 15, 2004. The State submitted a proof of claim for taxes incurred by RSI between October 2002 and August 2003 in the amount of $6,726,872.72. PW Enterprises submitted a proof of claim for money loaned, wagering winnings, and deposits in the amount of $2,248,100.86.

The bankruptcy court found, in part, there was an authorized tax on account wagering and even if RSI was not statutorily obligated to pay the tax, there was no prohibition against RSI paying the tax. PW Enterprises contends that because the State had no right to tax account wagering, the State should be ordered to return all monies collected to the estate and the State's claim for taxes should be disallowed.

---

[5] Between August 14, 2003 and August 26, 2003, which was a short period of time before and after the receiver was appointed, the State collected seven checks totaling just over $1.7 million dollars. Six checks were dated August 14 and one check was dated August 19.

## DISCUSSION

**A.      Standard of Review.**

A district court reviewing a bankruptcy court's order on appeal adopts the following

standard of review:

> Findings of fact, whether based on oral or documentary evidence, shall not be set
> aside unless clearly erroneous, and due regard shall be given to the opportunity of
> the bankruptcy court to judge the credibility of witnesses.

Fed.R.Bankr.P. 8013.  The Eighth Circuit has further elaborated that when a bankruptcy court's

judgment is appealed to the district court, the district court acts as an appellate court.  Fix v. First

State Bank of Roscoe, 559 F.3d 803, 808 (8th Cir. 2009) (quoting In re Falcon Prods., Inc., 497

F.3d 838, 840-41 (8th Cir. 2007)). Findings of fact are evaluated for clear error, and all legal

determinations made by the bankruptcy court are reviewed *de novo*.  DeBold v. Case, 452 F.3d

756, 761 (8th Cir. 2006).  Conclusions involving mixed questions of law and fact are also

reviewed *de novo*.  Id.  A factual finding is clearly erroneous "when although there is evidence to

support it, the reviewing court on the entire evidence is left with the definite and firm conviction

that a mistake has been committed."  Anderson v. City of Bessemer City, N.C., 470 U.S. 564,

573 (1985) (quotation omitted).

**B.      The State of North Dakota Did Not Have Authority to Collect Taxes on
         Account Wagering Before 2007**.

The bankruptcy court found in the adversarial proceeding that the State conceded there

was no direct legislative authority to collect a tax on account wagering prior to the 2007

amendments.  On appeal, the State disputes it made such an admission and asserts, instead, that

although the specific term "account wagering" did not appear in the statute before 2007, N.D. Cent. Code §53-06.2-11 impliedly imposes a tax on account wagering (Doc. #12, p. 41).

The North Dakota Constitution provides that "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." N.D. Const. Art. X, § 3. The North Dakota Supreme Court has reiterated that "[t]he taxing power is exclusively a legislative function." Scott v. Donnelly, 133 N.W.2d 418, (N.D. 1965)). The power to tax cannot be delegated to an administrative board. Id. at 426.

Statutes are construed to ascertain legislative intent. Stephenson v. Hoeven, 737 N.W.2d 260, 267 (N.D. 2007). "In ascertaining legislative intent, [courts] look first to the words used in the statute, giving them their plain, ordinary, and commonly understood meaning. If the plain language of the statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because legislative intent is presumed clear from the face of the statute." In re G.R.H., 711 N.W.2d 587, 593 (N.D. 2006) (citations omitted). Courts are to presume the legislature said all that it intended to say. Larsen v. North Dakota Dept. of Transp., 693 N.W.2d 39, 43 (N.D. 2005). Words or phrases cannot be added by a court. Id.

The taxes at issue arose out of PW Enterprises' account wagering at RSI during 2002 and 2003. Two prongs must be satisfied before a tax can be collected: (1) there must be legislative action, and (2) there must be specification as to the target of the tax. N.D. Const. Art. X, § 3; See Gange v. Clerk of Burleigh County Dist. Court, 429 N.W.2d 429, 435 (N.D. 1988) (constitution requires a statutory objective before a tax can be collected). The 2001 version of the statute provided, in relevant part:

8

### § 53–06.2–10.1. Simulcast wagering

In addition to racing under the certificate system, as authorized by this chapter, and conducted upon the premises of a racetrack, simulcast parimutuel wagering may be conducted in accordance with this chapter and interim standards that need not comply with chapter 28–32, or rules adopted by the commission under this chapter. . . .The certificate system also permits parimutuel wagering to be conducted through account wagering. As used in this section, 'account wagering' means a form of parimutuel wagering in which an individual deposits money in an account and uses the account balance to pay for parimutuel wagers. An account wager made on an account established in this state may only be made through the licensed simulcast service provider authorized by the commission to operate the simulcast parimutuel wagering system under the certificate system. An account wager may be made in person, by direct telephone communication, or through other electronic communication in accordance with rules adopted by the commission. Breakage for interstate or international combined wagering pools must be calculated in accordance with the statutes or rules of the host jurisdiction and must be distributed among the participating jurisdictions in a manner agreed to among the jurisdictions.

The statute's heading references simulcast wagering. A headnote, however, whether designating an entire title, chapter, section, subsection, or subdivision, is not part of the statute. N.D. Cent. Code § 1-02-12.  The headnote cannot equate account wagering with simulcast wagering.

Until 2001, only two types of parimutuel wagering were allowed in North Dakota - live race wagering and off-track simulcast wagering.  In 2001, the legislature allowed for a third type of parimutuel wagering - account wagering - which it specifically defined as "a form of parimutuel wagering."  Giving the words their ordinary meaning, account wagering in this context is simply is a type of betting pool in which the bettors place a sum of money on an horse race.  Account wagering is not defined in the statute as a form of simulcast parimutuel wagering. If the legislature intended account wagering to equate to or be a subset of simulcast parimutuel wagering, it could have done so.

While there was legislative action expanding legal gambling in North Dakota to include

9

account wagering, the legislature did not enact a law allowing the State to collect taxes for account wagering activities. N.D. Cent. Code § 53-06.2-11 (2001).  There is nothing in the take-out statute prior to 2007 that would indicate the State was authorized to collect taxes on account wagering activities.[6]

When PW Enterprises was engaged in account wagering through RSI, there was neither legislative action directed at the collection of taxes for account wagering nor was there specification as to the amount of the tax.  The bankruptcy court erred when it concluded account wagering is simulcast wagering and thus the State was authorized to collect taxes on account wagering.  Because the State lacked the authority to collect taxes for account wagering activities during the 2002 to 2003 time period in question, the taxes collected by the State must be returned to the bankruptcy estate.

### C.     There is No Legal Basis to Infer or Imply the Authority to Tax.

The bankruptcy court stated: "Had the legislature not intended for account wagering to be subject to taxation under N.D.C.C. § 53-06.2-11, the activity authorized by the legislature in N.D.C.C. § 53-06.2-10.1 would have been in contravention of the prohibition against games of change without a charitable purpose as delineated in the North Dakota Constitution."  The court concluded: "Consistent with the rules of statutory construction, the Court presumes the legislature did not intend this absurd result." Similarly, the State argues on appeal, even if there is no authorized taxation, the Court should imply a tax because absent the means of taxation, the provisions of § 53-06.2-10.1 violate the State's constitutional restrictions on charitable gaming.

---

[6] The 2007 amendment to N.D. Cent. Code § 53-06.2-11 confirms that the legislature perceived a problem.  The amendment created a "take-out" formula specific to account wagering.

North Dakota's Constitution does not provide for implied taxes. Likewise, courts presume the legislature "meant what it said and said all it intended to say." Estate v. Christeson v. Gilstad, 829 N.W.2d 453, 457 (N.D. 2013). Courts are not to "correct an alleged legislative 'oversight' by rewriting unambiguous statutes to cover the situation at hand." Id. (citation omitted). Moreover, there is no rule of construction requiring courts to ferret out an interpretation in order to preserve the constitutional integrity of an unambiguous statute.[7]

Here, the legislature's intent is apparent from the words of the statutes and there is no room for construction. The legislature plainly defined "account wagering" in N.D. Cent. Code § 53-06.2-10.1. When it created this new form of parimutuel wagering, the legislature, either intentionally or unintentionally, did not amend the take-out statute, N.D. Cent. Code § 53-06.2-11, to provide formulas for account wagering activities. It is not within the Court's purview to rewrite the statutes to engraft additional meanings. Judges have no right to substitute their policy preferences for the legitimate policy preferences of the legislature, even though they might consider the policy unwise.

The Court need not delve into the legislative history because the statutes at issue are not ambiguous.[8] There are no words or phrases that are undefined. There is no inconsistency in

_____

[7] Even if the Court were to look at the alleged constitutional issue noted by the State, North Dakota's gaming laws and Constitution require the involvement of educational, charitable, patriotic, fraternal, religious, or "public-spirited uses." Taxes are not enumerated on this list.

[8] The parties have competing versions of what the legislature intended. PW Enterprises contends the legislature intended to create account wagering and entice wagerers to the State with an initial promise of no taxes and then after they were established to impose a tax. The State believes the legislature authorized account wagering as a way to bring additional revenue to North Dakota. The Court need not resolve the conflict because the language in the statutes is clear and there is no need to examine legislative history. In re G.R.H., 711 N.W.2d 587, 593 (N.D. 2006) (legislative intent is presumed clear from the face of the statute).

11

reading the statutes together.  Uncertainty arose because the State collected money in the form of taxes when there was no specific legislative action authorizing it to do so.  "It is for the legislature to amend a statute if the language of the statute does not accurately reflect the legislature's intent; the duty of the judiciary is to simply enforce the law as it exists."  State v. Blunt, 785 N.W.2d 909, 928 (N.D. 2010).  There was no legislative authority to collect taxes on account wagering during the time period in question and there is no legal basis to infer or imply authorization to do so.

> **D.    No Binding Precedent Exists that Would Preclude this Court from Reviewing _De Novo_ Whether the State Can Collect Taxes on Account Wagering Prior to 2007.**

The State argues that PW Enterprises' statutory interpretation claim has been waived or should be rejected by inference or implication, citing to documents and decisions filed in this Court in the criminal prosecution of Susan Bala and RSI.  The focus on Bala's criminal convictions stemmed from the requirement that, under North Dakota's gambling laws, some portion of account wagers must go to a charitable organization.  United States v. Bala, 489 F.3d 334, 339 (8th Cir. 2007).  The Eighth Circuit Court of Appeals, in reversing Bala's convictions, noted the "uncertain regulatory environment" under which RSI was operating.  Id. at 340.  The Court of Appeals concluded the prosecution failed to prove RSI or Bala violated a state gambling law; therefore, there was insufficient evidence to support the convictions.  The State also cites to documents relating to Bala's motion for a certificate of innocence.  Bala contended in one of her briefs that the statutory take-out scheme did not provide for taxing of account wagering during the time period at issue (Doc. #194).  Neither the district court nor the Court of Appeals addressed Bala's specific argument.

12

In addition, the State refers to Bala's § 1983 complaint and order dismissing the claims filed in this Court in 2009.  In that case, Judge Hovland determined that in 2001, N.D. Cent. Code § 53-06.2-10.1 did not expressly require that payments be made to the State from account wagering activities.  <u>Bala v. Stenehjem</u>, 671 F.Supp.2d 1067, 1088-87 (D.N.D. 2009).  He found that in 2007, the legislature amended the statutory laws to specify the amount that must be deducted from account wagering activities.

The State contends that a logical inference or implication that can be gleaned from Bala's criminal and civil files is that the court must have concluded that statutory authority existed to collect taxes on account wagering prior to 2007.  "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  <u>Webster v. Fall</u>, 266 U.S. 507, 511 (1925).  The Court declines the State's invitation to rely on inferences or implications in deciding whether the State was statutorily authorized to collect taxes on account wagering.

## <u>DECISION</u>

North Dakota's gambling laws are plain and unambiguous.  The State was not authorized to collect taxes on account wagering during the time period in question.  RSI had no obligation to pay taxes on account wagering and should not have depleted its assets to pay unowed taxes. The money collected from RSI in the form of taxes on account wagering must be returned to the bankruptcy estate.  The bankruptcy court's decision granting summary judgment in favor of the State is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this opinion.

The remaining issues, including whether the bankruptcy court erred when it found RSI

received reasonably equivalent value in exchange for the tax value, whether the State was a non-statutory insider, and whether the State's claims should be equitably subordinated, raised by PW Enterprises are moot.

**IT IS SO ORDERED**.

Dated this 3rd day of January, 2014.

*/s/ Ralph R. Erickson*
Ralph R. Erickson, Chief Judge
United States District Court